IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DWIGHT A. PENBERTH, JR.,             :        CIVIL ACTION NO. **3:CV-06-1023**
                                     :
             Plaintiff               :
                                     :
        v.                           :        Magistrate Judge Blewitt
                                     :
GEORGE KRAJNAK, et al.,              :
                                     :
        Defendants                   :
                                     :

**MEMORANDUM  AND  ORDER**

**I. Background.**

        This civil rights action under 42 U.S.C. § 1983 is presently proceeding *via* a Complaint of

the Plaintiff, Dwight A. Penberth, Jr., filed, through counsel, on May 19, 2006.  (Doc. 1).  Named

as Defendants are the following: George Krajnak, Mayor of the Borough of Lansford; James Strauss,

Chief of Police of the Borough of Lansford; and the Borough of Lansford ("BL").[1]  On June 16,

2006, the three Defendants jointly filed their Answer to Plaintiff's Complaint with Affirmative

Defenses.  (Doc. 4). Subsequently, the Court issued a Scheduling Order and discovery ensued.

(Doc. 11).  The parties have consented to proceed before the undersigned for all matters, including

trial, pursuant to  28 U.S.C. §636(c).  (Doc. 8).

        On March 15, 2007, Defendants  jointly filed a Motion  for Summary Judgment.  **(Doc. 15)**.

Further, Defendants  filed their Statement of Material Facts ("SMF") and support Brief with Exhibits

attached.  (Docs. 14 and 16).  Plaintiff filed his Responses to Defendants' SMF and his opposition

---

   1Plaintiff also asserts pendent state law claims against Defendants, including abuse of
process (Count One), malicious prosecution (Count Two) as well as false arrest (Counts
Three and Four).

Brief with Exhibits on April 11, 2007.  (Docs. 19 and 20).  Defendants filed their Reply Brief on

April 20, 2007.  (Doc. 21).  Defendants' Summary Judgment Motion is  ripe for disposition.

## II.  Allegations of the Complaint.

Plaintiff alleges  that in April  2005 he bid $550.00 on the sale, "AS IS", of a used police car

by Defendant BL.  There was no mention in the bid advertisement by BL that the car would be

stripped of police equipment.  (Doc. 1, pp. 1-2).  Plaintiff's bid was accepted by BL.  In May 2005,

the title to the car was transferred to Plaintiff and he took possession of it.

In Count One, Plaintiff alleges that Defendants Krajnak and Strauss, as employees of BL,
"maliciously decided to file knowingly false criminal charges against Plaintiff."  The criminal charges
filed against Plaintiff related to his alleged failure to timely return the police equipment that was still
in the car he purchased. (*Id.*, p. 2, ¶ 16.).  Plaintiff avers that at the time of the false charges,
Defendant Krajnak's son-in-law was running against Plaintiff's father for the position of Borough
Council.  Plaintiff alleges that Defendants Strauss and Krajnak "purposefully intended ... to publicly
portray Plaintiff as a criminal despite their knowledge that Plaintiff had not engaged in criminal
activity" and that these Defendants "sought to publicly disparage, embarrass and humiliate Plaintiff's
father by falsely accusing Plaintiff of criminal activity." (*Id.*, p. 3, ¶'s 17.-19.).  Plaintiff further avers:

> 20.    On about September 27, 2005, Defendant Krajnak by and
> through Defendant Strauss filed a felony and other charges against Plaintiff
> with an affidavit that Defendants knew was absolutely false in several regards.
>
> 21.    At the time aforesaid Defendants used the criminal legal process
> primarily to accomplish a purpose for which the process was not designed.

(*Id.*, ¶'s 20.-21.)

As a result of the above allegations, Plaintiff states that he suffered compensatory damages,

emotional distress, and that he is entitled to punitive damages.  (*Id.*, ¶'s 22.-24.).

We construe Plaintiff's Count One as his state law abuse of process claim.

In Count Two, Plaintiff alleges that Defendants Krajnak and Strauss "knowingly or grossly,

negligently instituted said legal proceedings against Plaintiff without probable cause."  Plaintiff states

that the criminal legal proceedings which Defendants filed against him terminated in his favor, and that as a result of Defendants' malicious prosecution he has suffered compensatory damages. Plaintiff also seeks punitive damages in Count Two. (*Id.*, ¶'s 26.-31.). We construe Plaintiff's Count Two as his state law malicious prosecution claim.

In Count Three, Plaintiff alleges that Defendants Krajnak and Strauss intentionally and purposefully arranged for his arrest even though there was no probable cause and that consequently, he was arrested without probable cause in violation of his Fourth Amendment rights. Plaintiff seeks compensatory damages and punitive damages in Count Three. (*Id.*, ¶'s 34.-39.). We construe Plaintiff's Count Three as his §1983 federal false arrest claim.

Count Four is against Defendant BL and Plaintiff alleges:

> 41.     At all relevant times, Defendant Borough had actual notice and knowledge that Defendant Krajnak and Defendant Strauss were planning and carrying out Plaintiff's arrest without probable cause.

> 42.     At all relevant times, Defendant Borough intentionally or acting with deliberate indifference promoted, allowed, condoned, accepted and/or acquiesced in individual Defendants' illegal arrest of Plaintiff.

> 43.     As a direct result of Defendant Borough's actions, policies and/or inactions, individual Defendants arrested Plaintiff without probable cause proximately resulting in injuries and damages specified above and incorporated herein for which Plaintiff seeks compensation.

(*Id.*, ¶'s 41.-43.).

In Count Five, Plaintiff alleges that Defendants Krajnak and Strauss "maliciously and intentionally interfered with Plaintiff's familial relationship with his father by purposefully attempting to pit Plaintiff's father against Plaintiff." Plaintiff claims that this conduct violated his Constitutional rights under the First Amendment and Fourteenth Amendment. (*Id.*, ¶'s 46.-47.).  This Count

contains Plaintiff's §1983 claim for violation of his First Amendment right to association against

Defendants Krajnak and Strauss.

In his final Count Six against Defendant BL, Plaintiff avers:

> 53.    At all relevant times, Defendant Borough intentionally or
> acting with deliberate indifference promoted, allowed, condoned, accepted
> and/or acquiesced in individual Defendants' purposeful interference with
> Plaintiff's familial relationships depriving Plaintiff of his First and Fourteenth
> Amendment rights to be free from such interference and damages resulting
> therefrom.

> 54.    As a direct result of Defendant Borough's actions, policies and/or
> inactions, individual Defendants interfered with Plaintiff's constitutional
> rights, proximately resulting in injuries and damages specified above and
> incorporated herein for which Plaintiff seeks compensation.

(*Id.*, ¶'s 53.-54.).

We construe Counts Four (Fourth Amendment) and Six (First Amendment) against

Defendant BL to be Plaintiff's Constitutional claims brought pursuant to *Monell*.[2]

As a result of the Defendants' alleged conduct, Plaintiff contends that his constitutional rights

were violated, predicating jurisdiction of this Court over this action under 42 U.S.C. Section 1983

("§1983") as well as 28 U.S.C. § 1331 and § 1343.  (Doc. 1, ¶ 5.).  As mentioned, Plaintiff also

asserts pendent state law claims, including false arrest, malicious prosecution, and abuse of process,

Counts One and Two, Doc. 1.  Plaintiff alleges that Defendant BL also violated his Constitutional

---

2.  We note that Plaintiff correctly does not seek punitive damages as against Defendant BL, and
only seeks punitive damages as against the two individual Defendants.  *See Smith v. Wade*, 461
U.S. 30, 103 S. Ct. 1625 (1983).

rights under a *Monell* theory of municipal liability, Counts Four and Six, Doc. 1.[3]

As relief, Plaintiff seeks compensatory and punitive damages as against Defendants Strauss and Krajnak in their official capacities, and he seeks compensatory damages as against Defendant BL.  As mentioned, Plaintiff seeks punitive damages against the individual Defendants (Strauss and Krajnak).  Plaintiff cannot recover punitive damages against the Defendant Borough in this case on his § 1983 claims.  We also have stated that Plaintiff correctly does not seek punitive damages against the Defendant Borough.[4]

As stated, in the federal Counts Three and Five, Plaintiff seeks as relief compensatory damages against both individual Defendants as well as  punitive damages.   (Doc. 1, ¶'s 38. - 39. and 48. - 50).  Plaintiff has sued Defendants Strauss and Krajnak only in their official capacities as agents and/or employees of Defendant BL acting within the scope of said relationship.  Plaintiff does not sue these Defendants in their individual capacities. (Doc. 1, p. 2, ¶ 15.).  However, to the extent that Plaintiff is suing Defendants Strauss and Krajnak in their official capacities as agents of

---

3.  This Court has jurisdiction over the federal claims under 28 U.S.C. § 1331 and § 1343(a). It is appropriate for this Court to exercise supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. §1367(a) if the federal claims under § 1983 remain.

4.  The Plaintiff is statutorily precluded from recovering punitive damages against local governmental agencies like the Defendant Borough, but not against the individual Defendants. The Supreme Court has determined that, absent a statute to the contrary, punitive damages cannot be awarded against a government entity. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748 (1981).  However, this preclusion of a punitive damages remedy does not apply to the  individual defendants. *Smith v. Wade*, 461 U.S. 30, 103 S.Ct. 1625 (1983). In *Smith*, the Court held that punitive damages may be recovered from individual defendants in certain § 1983 cases.

Defendant Borough, *i.e.* alleging that these Defendants were acting within the scope of their employment as Borough Police Chief and Mayor, respectively, (Doc. 1, ¶'s 2.-3.), we find that Plaintiff's damages claims against them in their official capacities must be dismissed.  *See Carlton v. City of Phila.*, 2004 WL 633279, *8 (E.D. Pa. 2004)("actions against government employees in their official capacities 'generally represent only another way of pleading an action against an entity of which an officer is an agent'") (citation omitted); *Douris v. Schweiker*, 229 F.Supp2d 391, 400 (E.D. Pa. 2002); *Dill v. Com. of PA,* 3 F.Supp.2d 583, 587 (E.D. Pa. 1998).  Plaintiff's claims against the individual Defendants, Police Chief Strauss and Mayor Krajnak, under § 1983 in their official capacities as Chief of Police and Mayor (Doc. 1, ¶ 15.) are, in effect, a suit against the Defendant Borough.  Since the Borough has been named as a Defendant herein, we see no need for official capacities claims against police Chief Strauss and Mayor Krajnak.  *See Kenny v. Whitpain Twp.*, 1996 WL 445352, *2 (E.D. Pa. 1996); *see also Atwell v. Schweiker*, 2007 WL 2900565 (3d Cir. 2007) (Non-Precedential).  In *Atwell*, the Court stated:

> The Eleventh Amendment bars a suit against state officials sued in their individual capacities because the state is the real party in interest inasmuch as the plaintiff seeks recovery from the state treasury.  *Melo v. Hafer*, 912 F.2d 628, 635 (3d Cir. 1990).  The Eleventh Amendment does not bar suits against state officials in their personal capacities.  *Id.*
>
> To determine whether a plaintiff sued a defendant in his personal capacity, official capacity, or both, we look to the complaint

6

and the course of proceedings. *Id.* In concluding that the official in *Melo* was sued in her personal capacity, we considered the fact that the plaintiffs sued, and only requested damages from, the official and not the state. *Id.* at 636.[5]

## III. Standards.

### A. Motion for Summary Judgment Standard

A motion for summary judgment may not be granted unless the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. The court may grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). An issue of fact is "'genuine' only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." *Childers v. Joseph*, 842 F.2d 689, 693-694 (3d Cir. 1988) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A fact is "material" if proof of its existence or non-existence could affect the outcome of the action pursuant to the governing law. *Anderson*, 477 U.S. at 248. "Facts that could alter the outcome are material facts." *Charlton v. Paramus Bd. of Educ.*, 25 F. 3d 194, 197 (3d Cir.), *cert. denied*, 513 U.S. 1022 (1994).

The burden of proving that there is no genuine issue of material fact is initially upon the movant. *Forms, Inc. v. American Standard, Inc.*, 546 F. Supp. 314, 320 (E.D. Pa. 1982), *aff'd mem.*

---

5. If the Court was going to deny Defendants' Summary Judgment Motion and allow this case to proceed to trial, Plaintiff would have been allowed leave to amend his pleading to clarify that he was suing Defendants Strauss and Krajnak in their individual capacities with respect to his claims for monetary damages. In any event, since Plaintiff seeks punitive damages against Defendants Strauss and Krajnak, any doubts as to the capacity in which these Defendants are sued would be resolved in favor of Plaintiff suing them in their personal capacities. *See Atwell, supra.*

725 F.2d 667 (3d Cir. 1983).  Upon such a showing, the burden shifts to the nonmoving party.  *Id*. The nonmoving party is required to go beyond the pleadings and by affidavits or by "depositions, answers to interrogatories and admissions on file" designate "specific facts showing that there is a genuine issue for trial."  Fed.R.Civ.P. 56(e).

In determining whether an issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party.  *White v. Westinghouse Electric Company*, 862 F.2d 56, 59 (3d Cir. 1988).  In doing so, the court must accept the nonmovant's allegations as true and resolve any conflicts in his favor.  *Id*., *quoting Gans v. Mundy*, 762 F.2d 338, 340 (3d Cir. 1985), *cert. denied,* 474 U.S. 1010 (1985); *Goodman v. Mead Johnson & Co*., 534 F.2d 566, 573 (3d Cir. 1976) *cert. denied*, 429 U.S. 1038 (1977).

Under Rule 56, summary judgment must be entered where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celetox Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Moreover, the Third Circuit has recently indicated that "although the party opposing summary judgment is entitled to 'the benefit of all factual inferences in the court's consideration of a motion for summary judgment, the nonmoving party must point to some evidence in the record that creates a genuine issue of material fact,' and 'cannot rest solely on assertions made in the pleadings, legal memorandum or oral argument.'" *Goode v. Nash*, 2007 WL 2068365 (3d Cir. 2007)(Non-Precedential)(citation omitted).

*B. Section 1983 Standard*

In a § 1983 civil rights action, the Plaintiff must prove the following two essential elements: (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct complained of deprived the Plaintiff of rights, privileges or immunities secured by the law or the Constitution of the United States. *Parratt v. Taylor*, 451 U.S. 527 (1981); *Kost v. Kozakiewicz*, 1 F. 3d 176, 184 (3d Cir. 1993)**.** Further, Section 1983 is not a source of substantive rights. Rather, it is a means to redress violations of federal law by state actors. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002).[6] *See also Holocheck v. Luzerne County Head Start, Inc.*, 385 F. Supp. 2d 491, 498-499 (M. D. Pa.).

It is well established that personal liability under section 1983 cannot be imposed upon a state official based on a theory of *respondeat superior*. *See, e.g., Rizzo v. Goode*, 423 U.S. 362 (1976); *Hampton v. Holmesburg Prison Officials*, 1546 F.2d 1077, 1082 (3d Cir. 1976); *Parratt, supra.* It is also well settled in the Third Circuit that personal involvement of defendants in alleged constitutional deprivations is a requirement in a § 1983 case and that a complaint must allege such personal involvement. *Id.* Each named defendant must be shown, through the complaint's allegations, to have been personally involved in the events or occurrences upon which Plaintiff's claims are based. *Id.* As the Court stated in *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998):

---

6. Plaintiff alleges in his pleading that the individual defendants were agents and employees of BL. (Doc. 1, pp. 1-2). This is sufficient to show that these Defendants were state agents. While Defendant BL is not a person for purposes of §1983, as discussed below, it can be named under §1983 based on a *Monell* theory of liability.

> A defendant in a civil rights action must have personal involvement
> in the alleged wrongs . . . . [P]ersonal involvement can be shown
> through allegations of personal direction or of actual knowledge and
> acquiescence.  Allegations of participation or actual knowledge
> and acquiescence, however, must be made with appropriate
> particularity. (Citations omitted).

## IV. Statement of Material Facts.

The moving Defendants base their instant Motion on Rule 56.  (Doc. 15).[7]  Presently pending before this Court is the joint Motion for Summary Judgment of Defendants  filed on March 15, 2007.  **(Doc. 15)**.  Defendants simultaneously filed their Statement of Material Facts ("SMF"). (Doc. 14, ¶'s 1.-38.).  Defendants also filed their support Brief (Doc. 16) with Exhibits (Exs. A and B).  Plaintiff filed his opposition Brief with several Exhibits  on April 11, 2007, as well as his response to Defendants' SMF.[8]   (Docs. 20 and 19, respectively).  Defendants then filed their Reply Brief on April 20, 2007.  (Doc. 21).

Plaintiff has admitted the following paragraphs of Defendants' SMF which were filed under Local Rule 56.1, M.D. Pa. (Docs. 14 and 19):  ¶'s 1.-9.; 11.-13.;16.-17.; 19. (to the extent that BL sent two letters to the Penberths requesting that they make arrangements to return unspecified

---

7.  As discussed above, since discovery has been completed and Plaintiff was aware of the basis of Defendants' present Motion as one for summary judgment, we shall consider the evidence submitted by both parties and treat Defendants' Motion as one for summary judgment under Rule 56.

8.  Attached to Doc. 20 are numerous deposition transcripts taken in this case, including Plaintiff's, Doc. 20-10, and Defendant Krajnak's, Doc. 20-7.  The Court could not locate a copy of Defendant Strauss' deposition transcript and thus directed Plaintiff's counsel to file it.  The transcript was filed on January 17, 2008 and is docketed as Doc. 22.

police equipment in the car); 21.-25.; and 28.[9]  Thus, for present purposes, we incorporate by reference all of the stated Defendants' SMF which have been admitted by Plaintiff since Defendants have properly cited to evidence to support each one of these admitted paragraphs.  We shall not repeat Defendants' undisputed SMF.

As stated, since the above mentioned paragraphs of Defendants' SMF are not disputed by Plaintiff in his Response (Doc. 19), we shall consider them as unopposed.  Therefore, we accept the stated facts contained in the stated paragraphs of Defendants' SMF  since they are not disputed by Plaintiff's response  thereto and are supported by the record, and we will adopt them as our own herein.  *See U.S. ex rel. Paranich v. Sorgnard*, 396 F. 3d 326, 330, n. 5 (3d Cir. 2005) (Under M.D. Pa. L.R. 56.1, the Third Circuit noted that the District Court adopted all the facts of one party that were not clearly disputed by the other party with sufficient citation to the record).[10]

We shall now discuss Defendants' SMF which are denied by Plaintiff.

---

9.  For some unexplained reason, Plaintiff's Response to Defendants' SMF (Doc. 19) contains 39 paragraphs, even though Defendants' SMF (Doc. 14) only contains 38 paragraphs.  It appears as though in response to ¶ 19. of Defendants' SMF (Doc. 19, ¶ 19.), Plaintiff's counsel added a third sentence, which he mistakenly numbered as being in response to ¶ 20. of Defendants' SMF.  Thus, ¶ 21. of Plaintiff's Response seems to correspond to ¶ 20. of Defendants' SMF, and every paragraph thereafter of Plaintiff's response, ¶ 22.-39., seems to correspond to the previous paragraph of Defendants' SMF.  Plaintiff's counsel is admonished for his failure to thoroughly review his filing (Doc. 19) prior to submitting it to the Court.  A simple cursory review of the stated filing would have lead Plaintiff's counsel to conclude there was a mistake since his Response had 39 paragraphs and Defendants' SMF only had 38 paragraphs,.  Paragraphs 1.-19. of Plaintiff's Response correctly correspond to ¶'s 1.-19. of Defendants' SMF.  In any event,  the Court has correctly considered ¶'s 21.-39. of Plaintiff's Response as being in response to ¶'s 20.-38. of Defendants' SMF, but the error wasted the Court's time.

10.  *See also Paranich* District Court case at 286 F. Supp. 2d at 447, n. 3.

As to ¶ 10. of Defendants' SMF, Plaintiff testified as follows:

> Q.    Did you have any conversations with anybody at the borough about what was going to be removed before you took possession of the car?
>
> A.    Specifics?
>
> Q.    Yes.
>
> A.    No.
>
> Q.    How about in a general sense?
>
> A.    Not that I can recall, no.
>
> Q.    When you were bidding on the police car, did you think you were bidding for a light bar attached to the police car?
>
> A.    I assumed I was bidding for whatever was on the car at the time I acquired it.
>
> Q.    So you thought you were bidding for a light bar on a police car?
>
> A.    No, just whatever it was.  I didn't know what they were taking off.
>
> Q.    Did you know what was still in the car when you made the bid?
>
> A.    Specifically, no.

(Doc. 20-10, NT 38).

As to ¶ 14. of Defendants' SMF, it is agreed by the parties that the Penberths do not remember telling Krajcirik at his garage that they would return the car later to have the police equipment in it removed, but Krajcirik remembers the stated conversation when the Penberths took the car after Plaintiff's bid was accepted.

12

As to ¶ 15. of Defendants' SMF, it is admitted that after Plaintiff picked up the car, a police officer asked him about getting back police equipment from inside the car.  Plaintiff testified:

> Q.      Now, when was the next time you had a conversation with anybody about the police car?
>
> A.      I don't know which day it was, but I know one time, one of the officers questioned  - -
>
> Q.      Go ahead.  Don't worry about me.  You worry about her. I'm not writing down.  The court reporter is.
>
> A.      My dad was donating his vibrating plate to the  - - I'm not sure if this was the next time or one of the times, but one of the officers stopped and asked if they could get the strobe something off the inside of the car.  And I was like  - - I know my dad or me were standing there loading this up and/or we just told them t contact us whenever, give us a call sometime and then they can come up and get it.  And I know they called once and they were  - - my mom, my dad and me were heading down to Hershey to my sister's apartment and we told them that it wasn't a good time, to call back.  And I don't know if they did.  I don't think they did.

(Doc. 20-10, NT 59).

As to ¶18. of Defendants' SMF, it is admitted that Plaintiff stated that he was never given a list of equipment that the police wanted back from the car.    (Doc. 20-10, NT 73).  The record also shows that Defendant Strauss testified that:

> Q.      You never talked to Dwight Penberth, Sr., personally about this matter?
>
> A.      On the phone one time I did when he had called the office.
>
> Q.      When was that  - - we're talking the [Plaintiff's] father now?
>
> A.      Right.  He had called me one day at the office about returning this stuff.  He wanted to know what articles had to be returned.  And he was told.

Q.      What did you tell him?

A.      I told him - - I started out with the tires, to which he threw a little bit of a fit.  He had a problem with the tires.  I tried to explain that they were new tires and had I been working at the time the car would not have been released with these tires on.  And police equipment, which I did not have an itemized list, but I mentioned the light bar, the radio, the cage.  Police equipment.

Q.      So you do agree  - - was this before you filed the charge?

A.      This was before I filed, yes.

Q.      So you told the father that you wanted the tires back?

A.      Correct.

Q.      Because they were good?

A.      Correct.  And it was my impression that this car was to be used only for an engine and a transmission.  That was the only objects that were a concern.

(Doc. 22, NT 17-18).[11]

As to ¶'s 20. and 37. of Defendants' SMF, which correspond to ¶'s 21.  and 38. of Plaintiff's

Response, Plaintiff's father testified:

Q.      Well, the letter says to call the chief, does it not?

A.      All right.  This is the one when he was away, all right. Now, I see, and I did call the chief, I called because Dwight was away.

---

11.  As noted above, since Defendant Strauss' deposition  transcript was not scanned as an exhibit attached to Plaintiff's Doc. 20, the Court contacted Plaintiff's counsel's office and requested that Strauss' transcript be separately filed.  Plaintiff filed Strauss' transcript on January 17, 2008, Doc. 22.  Attached to the deposition transcript of Strauss is a copy of the Criminal Complaint he filed against Plaintiff with the Affidavit of probable cause, arrest warrant and plea agreement.

Q.      Where was Dwight?

A.      That's, I think, when he was down at the shore, was when this came.

Q.      Again, I'm just trying to figure out, did you call the chief, because you opened Dwight's mail, or is it because you got it in your box at the Borough?

A.      Probably got it in the box, because I'm a real fanatic about other people opening other people's mail in my household.

Q.      What did he say?

A.      He said, what did you want back, and the first word out of his mouth was, the tires.  I said, you've got to be kidding, he said that and other stuff.  I said, what stuff?  He wouldn't give me an answer.  I said, this is a waste of my time.  I hung up on him, I believe.

Q.      When you said he wouldn't give you an answer, did he say anything else?

A.      Yeah, stuff, that's a hell of an answer from a police chief.

Q.      All right.  You said, what other stuff, and he said quote?

A.      He may have said radio and stuff, but as I told him before, we assumed that radio was gone because we couldn't see it in there.  My son or I didn't do a darn thing to that car the whole time it was in our possession.

Q.      So the chief, in response, said, radio and stuff, correct?

A.      Right, something to that effect, yes.

Q.      What did you say in response?

A.      I said, the radios not even in there.

Q.      Did you say anything else?

A.      I said, this is a lot of crap, or something like that.  I don't

15

remember the specifics of the phone call, how it ended, I just remembered
conversation about the tires again, because that's all he kept saying.

(Doc. 20-9, NT 54-55).

Defendant Strauss testified as follows:

Q.   So you talked to the father once before you filed the charge, correct?

A.   Correct.

Q.   Did you talk to the son, Dwight, Jr., before you filed
the charges?

A.   No, I did not.

Q.   But you were not arresting the father?

A.   No.

Q.   You were arresting the son?

A.   Correct.

Q.   And you never talked to him?

A.   No, I didn't talk to him.  Other people did.

Q.   Do you agree that there was no urgency about filing this
criminal complaint, was there?

A.   There was no urgency, no.

Q.   So you had time to talk to the son about the case, correct?

A.   I could have done that, which I didn't do, you're correct.

Q.   Why didn't you do it?

A.   Because everyone else  - - not everyone else, but other people had.

(Doc. 22, NT 18-19).

As to ¶ 26. of Defendants' SMF, which corresponds to ¶ 27. of Plaintiff's Response, Plaintiff admits that he read in the newspaper that the police filed a criminal complaint against him and that he made arrangements, in part, through his father, to turn himself in at the district justice's ("DJ") office, but he states that he first heard about the charges filed against him from his mother.[12]

As to ¶ 27. of Defendants' SMF, which corresponds to ¶ 28. of Plaintiff's Response, Plaintiff testified:

> Q.    Did you turn yourself in?
>
> A.    Yes.
>
> Q.    What day?
>
> A.    I don't know.  It's written down in the affidavit.
>
> Q.    What happened?  How did you do that?
>
> A.    I walked in, Officer Soberick filled out paperwork, I guess, and then I went in front of Mr. Kosciolek [District Justice].
>
> Q.    Did you come into the police station or to the DJ's office?
>
> A.    District justice.  And I was photographed and put in the paper too.
>
> Q.    Dd you call ahead of time to arrange for the time to turn yourself in?
>
> A.    Yeah.
>
> Q.    Did your dad handle that or did you do that?
>
> A.    I had him call down because he knows Casi.

---

12.  As discussed below, Plaintiff was not arrested and was not taken into custody by police.  He was not handcuffed and was not detained after he turned himself in.

Q.     When you got down to the DJ's office, were you handcuffed at all?

A.     No.

Q.     Were you fingerprinted?

A.     No.

Q.     How long were you at the DJ's office before you were released?

A.     Around maybe half hour, 45 minutes.  I don't know.  I'm not positive about the exact time.  It wasn't all day.

Q.     Did you have to pay any bail money?

A.     I was put on ORO or  - -

          MR. ORLOSKI:          ROR [Released on Own Recognizance].

Q.     So you didn't have to put up any money?

A.     No, because I had no previous criminal history.

Q.     Do you have any other lawsuits besides this one?  Have you ever filed any other lawsuits?

A.     No.

Q.     Have you ever been sued before?

A.     No.

Q.     After you were released, did you have to go to a court hearing?

A.     Yes.

Q.     When was that?

A.     Don't know the specific date.  It's written down there.

Q.      Did you ever have to spend any time in a holding cell or in the police department for any amount of time?

A.      No.

Q.      Did you ever come to the police department at all?

A.      No.

Q.      When you were with Officer Soberick at the DJ's office, what did Officer Soberick do?

A.      He came in, he filled out the paperwork, said something like I guess I got all the dirty work or something and walked out.  He didn't walk out, he walked into the hearing, stood there and then once the hearing was over he took off.

Q.      Did he say anything to you at all other than what you've testified to?

A.      No.

(Doc. 20-10, NT 110-112).

As to ¶ 29. of Defendants' SMF, which corresponds to ¶ 30. of Plaintiff's Response, Plaintiff

testified:

Q.      What did Mr. Yurchak say when he called you?

A.      Basically he said they're just giving him  - - they just keep asking him questions about it and would I mind trying to solve it.  And that was about it.  I mean he wasn't real formal about it.  He said he's not giving me a hard time, he said it's really not that  - - not like he was giving me a threatening call or anything.  He just called me.  I was at work so I was at work while I was talking to him, just like casual conversation.

Q.      Did Mr. Yurchak tell you that the borough wanted items returned from the police car during that conversation?

A.      Yeah.

19

> Q.      Did he tell you that he wanted  - - the borough wanted you to call the chief to discuss the details?
>
> A.      No.  He just said if I could get a chance, contact somebody and take care of it.

(Doc. 20-10, NT 140).

As to  ¶ 30. of Defendants' SMF, which corresponds to ¶ 31. of Plaintiff's Response, Plaintiff's mother stated:

> Q.      [D]id you know at any time, did you ever learn that your husband had contacted the Borough?
>
> A.      Yes.
>
> Q.      Did he discuss returning police equipment.
>
> A.      Yes.
>
> Q.      Before your son's arrest?
>
> A.      Yes.

(Doc. 20-6, NT 20-21).

As to  ¶ 31. of Defendants' SMF, which corresponds to ¶ 32. of Plaintiff's Response, Plaintiff's mother stated:

> A.      . . .  I said, common sense, it wouldn't be a felony, because the kid didn't steal the vehicle, but I said, if that was the route they went, I called him at work, and it was  - -
>
> MR. ORLOSKI:      You called him at work; who's the him you're talking about?
>
> A.      My husband.
>
> Q.      What did you tell him when you called him at work?

20

A.      I said, it was in the paper.  My sister called and said Dwight, Junior was being arrested with felony charges.  He said, it should have been a civil suit, if they were going to proceed.  I said, well, I don't know the law. I said, you know more than I do, because he went to criminal justice school, and he said, you got to be kidding, and I said, no, and that was the end of the conversation, and the evening got exciting.

Q.      Now, had your son actually been arrested by the police when your sister called, to your knowledge?

A.      No, we had no knowledge of any of this.

Q.      Do you know when your son was actually physically arrested?

A.      When my husband came home from work, the next day, we called the district justice and told him what had happened, and he said yes, I have the paperwork here, and we were on the way to Pottsville, for some reason, that day, I don't remember for what, and my husband said, what should he do?  He said, don't worry about it.  He said, it's no big deal. He said, it's only a civil suit, and my husband said, no, it's not a civil suit, it's a felony, and the DJ said, couldn't be, Dwight, I just looked at it. He said, well, you better look at it again.  He said, wow, it is a felony charge. He said, the best thing to have your so do is to turn himself in so he's not picked up off the street.

(Doc. 20-6, NT 31-33).

As to ¶ 32. of Defendants' SMF, which corresponds to ¶ 33. of Plaintiff's Response, Plaintiff's

mother stated:

Q.      Did your son ever have to seek any medical treatment as a result of any emotional problems as a result of his arrest?

A.      No.  I almost did.

Q.      Did he ever spend any time in jail as a result of his arrest?

A.      No, he turned himself in.

Q.      After he turned himself in and was processed, what happened to him?

> A.      He was released to his own recognizance, I guess.  I don't know.  I wasn't with him.

> Q.      Well, did your son ever tell you that he wasn't handcuffed?

> A.      No, that's why he turned himself in, so he wouldn't be.

(Doc. 20-6, NT 59).

As to ¶ 33. of Defendants' SMF, which corresponds to ¶ 34. of Plaintiff's Response, Plaintiff's father stated that after Nicole Tessitore told him Plaintiff got the bid for the police car, she said:

> Q.      Did she say anything else?

> A.      She said, I'll get back to you.  Well, I think I asked her, are you going to let us know when it's ready, and she said, I'll get back to you, but that was it.  Again, it was no big conversation.

> Q.      Do you remember when that conversation took place, if the award was made April 19th, 2005?

> A.      Whatever the next day was, probably.

> Q.      Did you have any further discussions with Nicole during that phone call?

> A.      Other than what I said, no.

> Q.      So, the way it was left was, somebody from the Borough would contact you wh en the car was ready, correct?

> A.      Yeah.

(Doc. 20-9, NT 16).

However, BL secretary Nicole Tessitore stated:

> A.      We went over this one.  Dwight called me on the 25th about transferring the title again.

On Thursday, May 26th, I called the insurance company to remove the vehicle off of our insurance.  Dwight was also in my office that day regarding the transfer of the title.  That was the day I went up to the state representative's office.

Q.    That was the day you transferred title?

A.    Yes.

Q.    And the council president didn't get back to you to say there was a problem?

A.    Correct.

Q.    So you were relying on that?

A.    Correct.

And then on May 27th the first thing in the morning Dwight was in my office again verifying the transfer of title.  That was it regarding the car for that day.  That was the day that I had deposited the check.

Q.    Did the check clear?

A.    Yes.

(Doc. 20-13, NT 32).

As to ¶ 34. of Defendants' SMF, which corresponds to ¶ 35. of Plaintiff's Response, Plaintiff's

mother stated:

Q.    But I want to focus at the beginning, early on.  Did somebody call you from the Borough approximately, it says 3 weeks before the June 7th meeting, about the car?

A.    I guess somebody  - - I made the statement that I got a call, I don't remember who.

Q.    But it says you got a call to get some stuff off, correct?

A.    That's what it says here.

23

Q.      Do you remember who that was that called you?

A.      No.

Q.      Okay.  Do you remember what they were referring to about getting stuff off the car?

A.      No, because that was probably the exact wording they used; they never gave us a list of what they wanted.

Q.      But when this person called, do you remember, do you have an independent recollection about a phone call where somebody in the Borough asked you about getting stuff out of that car?

A.      Not specifically, I can't say.

(Doc. 20-9, NT 34-35).

As to ¶ 35. of Defendants' SMF, which corresponds to ¶ 36. of Plaintiff's Response, Plaintiff's

father stated:

A.  There was an invitation to bid, he bid what he felt was appropriate. The Borough came to him, took his check, transferred title, the car was advertised as is, come and see, at a certain location. Had they removed that stuff after, wouldn't that have been fraud on the borough's part?  If you say to somebody come, look at this car, it's being sold as is.  Then you couldn't pull equipment off of it, either; then they would have been liable.  So, once he purchased the car, they had more than sufficient time.  That was his property.

Q.      All right.  Now, in the meeting minutes, it says that Mr. Penberth states that the police wanted to do it today, meaning take the stuff out of the car, and that he said no.  Who from the police, to your knowledge, wanted  - -

A.      That may have been the time Officer Soberick called.  I got one call from Jackie, and Dwight was doing Borough work, and I happened to be there.  He said, dad, come out and give me a hand with this.  He was using a tammer. I gave him a hand, but he made a statement, I believe it was Chris  - -

MR. ORLOSKI:      Please use full names.

24

A.      Officer Ondrus, he wasn't on duty at the time, but someone --
and again, it may not have been Officer Ondrus  - - made the statement
that the VASCAR and most of that stuff was junk, anyway.  They didn't
know what the fuss was about.

(Doc. 20-9, NT 39-40).

Plaintiff's father also stated:

Q.      And as of June 7, '05, did you believe that the Borough wanted
additional items from the car?

A.      Oh, yes.

Q.      Did you have any discussion with your son about removing
any additional items from the car and returning it to the Borough?

A.      I'm sure we discussed that.

Q.      What did you discuss?

A.      Basically, the option, in my opinion, was, it was up to
him, it was his vehicle.

(Doc. 20-9, NT 41).

As to ¶ 36. of Defendants' SMF, which corresponds to ¶ 37. of Plaintiff's Response, Plaintiff's

father stated:

Q.      Did you have any discussions with Bob Yurchak, the
Borough solicitor, about the police car?

A.      I'm sure I did.

q.      When was the first time?

A.      Probably at a council meeting when it was brought up
by the public.

Q.      Do you remember when?

25

A.      No.

Q.      Do you remember what you discussed with him?

A.      No specifics, just small talk about it.

Q.      What was the small talk?

A.      Nothing in specific.  It was brought up; not like we said, well, we can do this; nothing of that magnitude.  It was just, you know, have Dwight call me, or whatever.

Q.      Have Dwight call about what?

A.      That's what I'm saying, that's the kind of statements there were; have him call me doesn't mean anything.  I believe he did speak to Attorney Hurchak.

Q.      When was the first time Mr. Yurchak told you to have your son call him?

A.      I don't remember specifically.

Q.      When he told you to have your son call him, was it with respect to the police car, or some other issue?

A.      With respect to the police car.

Q.      Did he tell you why wanted you to have your son call him?

A.      About this alleged equipment.

(Doc. 20-9, NT 44-45).

As to ¶ 37. of Defendants' SMF, which corresponds to ¶ 38. of Plaintiff's Response, see our discussion above regarding ¶ 20. of Defendants' SMF.

As to ¶ 38. of Defendants' SMF, which corresponds to ¶ 39. of Plaintiff's Response, Plaintiff's father testified:

26

Q.      Did you ever have any conversation with Mark Krajcirik, where you told him that you knew that equipment was supposed to be removed from the police car before your son took possession?

A.      That I knew it was supposed to be removed?  Yeah, they said it was supposed to be removed before they sold the car.

Q.      Did you have any idea what was to be removed from the car before your son took possession?

A.      I just assumed they would take what they wanted.

Q.      But did you have an understanding of what that equipment was?

A.      No.

Q.      Do you know if any equipment actually was removed from the car before your son took possession?

A.       I don't know what was removed.  As I said, the interior had been tossed and tumbled.

(Doc. 20-9, NT 69-70).

**V.  Discussion.**

*1.  Section 1983 Claims based on the Fourth Amendment*

As stated, Plaintiff avers in Counts Three and Five that Defendants Krajnak and Strauss are state actors and that they  violated his First Amendment, Fourth Amendment, and Fourteenth Amendment rights, in part, by falsely  arresting him and by maliciously interfering with his familial relationship.  Plaintiff states that his Count Five is a claim for violation of his associational rights under the First Amendment.  (Doc. 20, p. 14).  Plaintiff bases Counts Three and Five against Krajnak

and Strauss on §1983.[13]   Counts One and Two, Pennsylvania State common law claims for abuse of process and malicious prosecution, are asserted against the two individual Defendants. (Doc. 20, pp. 1 and 7).   Finally, in Counts Four and Six, Plaintiff asserts Constitutional claims against Defendant BL based on *Monell*.[14]   (Doc. 20, p. 13).   As stated, Plaintiff seeks both compensatory and punitive damages as against Defendants Krajnak and Strauss, and only compensatory damages as against Defendant BL.  (Doc. 1, pp. 3-9).

Initially, Defendants argue that all of Plaintiff's claims based on an illegal seizure of his person should be dismissed since the evidence fails to show that he was seized under the Fourth Amendment. (Doc. 16, pp. 3-5).   In particular, Defendants contend  that they are entitled  to summary judgment with respect to Plaintiff's Fourth Amendment claims pursuant to § 1983 contained in Counts Three and Four, as well as his Counts One and Two, Pennsylvania State common law claims for abuse of process and malicious prosecution.   Plaintiff argues that he has produced sufficient evidence to support his Fourth Amendment claims against Defendants Krajnak and Strauss, and that his evidence is sufficient evidence to support his Pennsylvania State common law claims for abuse of process and malicious prosecution.   (Doc. 20, pp. 1-13).

---

13.  The two individual Defendants named in Counts Three and Five, Plaintiff's § 1983 claims, namely Krajnak and Strauss, are indeed state actors for purposes of § 1983.

14.   When a claim against a municipality or governmental entity such as BL  is based on Section 1983, the entity can only be liable when the alleged constitutional violation implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom.  *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018 (1978).

We first consider Plaintiff's Fourth Amendment claims under § 1983 against Defendants Krajnak and Strauss in Count Three.

On September 27, 2005, Defendant Strauss filed a criminal complaint and executed an affidavit of probable cause against Plaintiff, and charged him with theft by unlawful taking (Felony third degree) and theft from a motor vehicle (misdemeanor first degree), in violation of 18 Pa. C.S.A. §§ 3921(a) & 3934(a).  (Doc. 16, Ex. B, and Doc. 22-2, NT 77-78).  Plaintiff read in the newspaper that charges were filed against him, and he asked his father to arrange his voluntary surrender. Plaintiff reported to the District Justice's ("DJ" Kosciolek) office.  (Doc. 20-10, NT 110).  As stated above, Plaintiff was not handcuffed, not fingerprinted, not detained, not taken into custody, and was at the DJ's office for about 30 to 45 minutes before he was released on his own recognizance. (*Id*., NT 110-111).  Plaintiff did not spend any time in a holding cell or in the police department. Plaintiff never even went to the police department.  (*Id*.).  There is no evidence that Plaintiff had any geographic restrictions imposed on him.

Thus, Plaintiff was arrested and charged with the stated two theft offenses *via* the criminal complaint and affidavit prepared by Defendant Strauss.  (Doc. 16, Ex. B).  A district justice, DJ Kosciolek, approved of the complaint against Plaintiff.  Subsequently, the charges against Plaintiff were withdrawn with prejudice at his preliminary hearing.  The charges against Plaintiff were withdrawn with prejudice pursuant to a handwritten agreement between Plaintiff and the DA's Office.  The agreement stated:

> Mr. Penberth is to bring the automobile in question to Krajcirik's

Garage for the removal of the above items.[15]  Upon completion, the
Borough will withdraw all charges against Mr. Penberth with prejudice.

Borough of Landsford will make a public statement that "all charges
against Mr. Dwight Penberth Jr. have been withdrawn with prejudice."

The car will be taken to Krajcirik's Garage by 5 a.m. on
10/7/05.  ALL items will be removed and [the car] returned to Mr. Dwight
Penberth Jr. by 5 a.m. on 10/8/05.

(Doc. 22-2, Att. #3).

The District Attorney's Office did not continue to prosecute the criminal case against Plaintiff

in light of the stated agreement.  Thus,  Plaintiff had the charges filed against him withdrawn with

prejudice.[16] (Doc. 22-2).

Based on the undisputed evidence, Defendants argue that Plaintiff was not seized under the

Fourth Amendment and thus, they are entitled to summary judgment with respect to his §1983

claims against them based on the Fourth Amendment.  Plaintiff contends that he has shown through

the evidence that he was arrested and that his property was seized without probable cause, and

that his Fourth Amendment claims against Defendants Krajnak and Strauss under §1983, contained

in Count Three, should proceed to trial.  (Doc. 20, pp. 9-13).

Defendants also move for summary judgment with respect to Count Three, Fourth

Amendment illegal seizure claims under § 1983 against Defendants Krajnak and Strauss, as well as

15.  Doc. 22-2, Att. #3, lists the ten items to be removed from the car Plaintiff purchased from
BL.

16.  This undisputed fact satisfies the actual innocence element of a §1983 malicious
prosecution action.  *See Hector v. Watt*, 235 F.3d 154, 156 (3d Cir. 2000);  *Lopez v. Maczko*,
2007 WL 2461709, *3, n. 6 (E.D. Pa. 2007)(dismissal of charges at preliminary hearing  before
DJ qualifies as the criminal proceeding terminated in Plaintiff's favor).

Counts One and Two, state law claims, arguing that Defendant Strauss had probable cause to arrest Plaintiff.   As mentioned, Count One asserts a state law claim  of abuse of process and Count Two raises a state law malicious prosecution claim.

Defendants argue that Count Three, § 1983 civil rights claims under Fourth Amendment for an illegal seizure  as against Defendants Krajnak and Strauss, should be dismissed since there was no seizure of Plaintiff.  Plaintiff argues that he was arrested and his property was seized without probable cause, and that he has shown § 1983 claims against Defendants based on his arrest without probable cause. (Doc. 20, p. 9).  Plaintiff states that Count Three is a Fourth Amendment claim for false arrest under § 1983.  (Doc. 20, p. 9).  Plaintiff avers that Defendants Krajnak and Strauss intentionally arranged for his arrest despite lacking probable cause for his arrest, and that based on their conduct, he was arrested without probable cause in violation of his Fourth Amendment rights. (*See* Doc. 1, ¶'s 34.-35.).

Plaintiff also seems to allege in Count Three a Fourth Amendment claim for malicious prosecution under § 1983. (*Id*.).  However, we find that Count Three contains a § 1983 malicious prosecution claim and not a § 1983 false arrest claim.  (Doc. 1, ¶'s 34.-35.).

The Court in *Johnson v. Knorr*, 477 F. 3d 75, 82 (3d Cir. 2007), stated that "[m]alicious prosecution differs from false arrest inasmuch as '[a] claim for false arrest, unlike a claim for malicious prosecution, covers damages only for the time of detention until the issuance of process or arraignment, and not more.' (citations omitted).  Unlike a claim for false arrest, a malicious prosecution claim allows for "damages for confinement imposed pursuant to legal process." *Id*. (citation omitted).  In our case, Plaintiff seeks damages for the alleged violations of his Fourth

31

Amendment rights, but  since the evidence shows that he was not detained at any time after the criminal charges were filed against him until he went to the DJ for arraignment and process was issued with respect to the criminal charged filed against him, we find that our Plaintiff is really claiming a §1983 malicious prosecution claim and not a §1983 false arrest claim.  Simply stated, Plaintiff was not detained prior to his arraignment.   Also, our Plaintiff argues that he and his property were seized after he learned about the charges against him and he turned himself into the DJ for processing and he was released on his own recognizance.  (Doc. 20, p. 12).  He does not argue that he was seized based on any detention which occurred prior to his arraignment and to the issuance of process at the DJ's office.   Rather, our Plaintiff claims that he incurred damages for his seizure which occurred pursuant to legal process.   The *Johnson* Court also noted that "[t]he deprivation of liberty requirement is applicable where the malicious prosecution claim is under the Fourth Amendment: and that "the Plaintiff 'must show some deprivation of liberty consistent with the concept of 'seizure.'"   *Id.*, n. 8 and n. 14.   As stated, our Plaintiff's Count Three § 1983 malicious prosecution claim is based on the Fourth Amendment (Doc. 1, ¶'s 34.-35.).[17]

In his Brief, Plaintiff argues that the issue with respect to his §1983 claim asserted in Count Three is whether Defendant Strauss had probable cause to believe that he committed the two theft offenses.  (Doc. 20, p. 9).

---

17.  Count One raises a state law claim for abuse of process, and Count Two states a state law claim for malicious prosecution against Defendants Krajnak and Strauss.

As mentioned, we find that Plaintiff has asserted both § 1983 and state law malicious prosecution claims[18] against Defendants Krajnak and Strauss.[19]   (Doc. 1, Counts Two and Three).

As the Third Circuit indicated  in *Backof* and  *Johnson* that with respect to the elements of a §1983 malicious prosecution claim based on the Fourth Amendment, the following are the requisite elements of a §1983 malicious prosecution claim:

> At a minimum, a plaintiff must allege (1) deprivation of liberty
> (or perhaps some other constitutional right [FN6]) separate
> from substantive due process, *Albright v. Oliver*, 510 U.S. 266,
> 271 n. 4, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994); (2) an absence
> of probable cause for initiation of the criminal proceedings,
> *Montgomery v. DeSimone*, 159 F.3d 120, 124 (1998); and
> (3) termination or reversal of criminal proceedings by reason of
> the plaintiff's innocence, [FN7] *Heck v. Humphrey,* 512 U.S. at 484;
> *Smith*, 87 F.3d at 110.
>
> Following the Supreme Court's 1994 decision in *Albright*, we
> concluded that "prosecution without probable cause is not, in
> and of itself, a constitutional tort.  Instead, the constitutional
> violation is the deprivation of liberty accompanying the
> prosecution.  Thus . . .  a plaintiff asserting a malicious
> prosecution claim must show some deprivation of liberty

18.  A civil rights claim for malicious prosecution is cognizable under §1983.  *See Losch v. Bor. of Parkesburg*, 736 F. 2d 903, 907-908 (3d Cir. 1984).

19.  Plaintiff does not state if he is suing Defendants Krajnak and Strauss  under § 1983 in their individual capacities. (Doc. 1, p. 1).  Plaintiff avers however that "[a]t all relevant times Defendant Krajnak and Defendant Strauss were acting as agents, servants, and/or employees of Defendant Borough with the scope of such relationship."  (Doc. 1, ¶ 15.).  Thus, as noted above, even though it appears as though these Defendants are only sued in their [Defendants'] official capacities, since in Counts One, Two, Three and Five, Plaintiff requests punitive damages against Defendants Krajnak and Strauss, we assume Plaintiff sued these Defendants in their personal capacities.  As stated, Plaintiff cannot get monetary damages against these Defendants in their official capacities.  *See Atwell v. Schweiker*, *supra*.  Plaintiff can only recover punitive damages against these Defendants in their individual capacities.

> consistent with the concept of seizure." *Gallo v. City of Philadelphia*, 161 F.3d 217, 222 (3d Cir. 1998) (internal quotations and citations omitted).

*Backof v. New Jersey State Police*, 2004 WL 260779 *3 (3d Cir. 2004); *Johnson v. Knorr*, 477 F. 3d 75, 82 (3d Cir. 2007).[20]

The *Backof* Court did not decide whether the Plaintiff must also allege the common law elements of a malicious prosecution claim.  However, it did suggest that Plaintiff Backof's pleading should address each of the common law elements of a malicious prosecution claim "to the extent possible." *Id*. at *4.  The *Backof* Court stated that the common law elements were as follows:

> To prove malicious prosecution under section 1983, a plaintiff must show that: (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

*Id*. (citing *Estate of Smith v. Marasco*, 318 F. 3d 497, 521 (3d Cir. 2003)).  *See also Johnson v. Knorr*, 477 F. 3d 75, 82 (3d Cir. 2007).

The *Backof* Court further stated "[i]n order to state a claim for malicious prosecution under §1983, [Plaintiff] must allege deprivation of a qualifying constitutional right." *Id*. at *3 (citing *Donahue v. Gavin*, 280 F. 3d 371, 378 (3d Cir. 2002)).  In our case, the Plaintiff has alleged the violation of his constitutional rights under the Fourth Amendment.  (Doc. 1, ¶ 35.).  The evidence

---

20. The *Backof* Court noted that the Plaintiff must demonstrate that he/she is actually innocent of the charged crime.  *Backof,* 2004 WL 260779 *3**,** n. 7.  Here, as noted, Plaintiff has undisputedly satisfied this element.  *See Lopez v. Maczko*, 2007 WL 2461709, *3, n. 6 (E.D. Pa. 2007).

also shows that the criminal charges filed against Plaintiff were withdrawn after Plaintiff took the

car on October 7, 2005 to have all of the remaining police equipment removed from it. (Doc. 22-

2, Att. # 3). This evidence is not disputed by Defendants.

The Court in *Morley v. Phila. Police Dept.*, 2004 WL 1527829, * 5 (E. D. Pa.), stated:

> When alleging a Section 1983 malicious prosecution claim under the
> Fourth Amendment, the Court of Appeals for the Third Circuit
> ("Third Circuit") requires the showing of the common law elements
> and "the plaintiff must also establish that he was seized within the
> meaning of the Fourth Amendment." [FN10] *Id*. at 484 (citing *Gallo v.
> City of Phila.*, 161 F.3d 217 (3d Cir. 1998); *see also Donahue v.
> Gavin*, No. 98-1602, 2000 WL 772819, at * 3 (E.D. Pa. June 15, 2000)
> (stating that "[w]here a section 1983 claim for malicious prosecution
> is grounded in the Fourth Amendment, the Court of Appeals has
> required a plaintiff to establish – in addition to the elements of
> the common law tort – a deprivation of liberty which is consistent
> with the concept of 'seizure'"), *aff'd*, 280 F.3d 371 (3d Cir. 2002).
>
>> FN10. In the Third Circuit, the concise test for establishing
>> a Section 1983 malicious prosecution claim is unclear. *See
>> Backof v. NJ State Police*, 92 Fed.Appx. 852, 856 (3d Cir. 2004)
>> (unpublished opinion). Although the test for establishing a
>> Section 1983 malicious prosecution claim may be somewhat
>> uncertain, the Third Circuit has provided some guidance by
>> identifying "several elements essential to a § 1983
>> malicious prosecution claim." *Id*. "At a minimum, a plaintiff
>> must allege (1) deprivation of liberty (or perhaps some other
>> constitutional right) separate from substantive due process;
>> (2) an absence of probable cause for initiation of the
>> criminal proceedings; and (3) termination or reversal of
>> criminal proceedings by reason of the plaintiff's innocence."
>> *Id*. (footnotes and internal citations omitted).

*See also Hanks v. County of Delaware*, 518 F. Supp. 2d 642, 651 (E.D. Pa. 2007); *Lopez v. Maczko*,

2007 WL 2461709, *3 (E.D. Pa. 2007).

As noted, Plaintiff has shown that he was actually innocent, which is a requirement in a §1983 malicious prosecution action. *See Hector v. Watt*, 235 F. 3d 154, 156 (3d Cir. 2000); *Lopez v. Maczko*, 2007 WL 2461709, *3 , n. 6. The issue turns to whether the Plaintiff has sufficiently shown that there was no probable cause for his arrest and whether there was a seizure of Plaintiff. Defendants contend that Plaintiff fails to establish a § 1983 claim under the Fourth Amendment in his Count Three since there was no seizure of Plaintiff. (Doc. 21, pp. 8-9). As noted, in *Johnson*, the Court stated that for a malicious prosecution claim based on the Fourth Amendment, as our Plaintiff's claim is based, Plaintiff has to "show some deprivation of liberty consistent with the concept of seizure." *Johnson v. Knorr*, 477 F. 3d 75, 85, n. 14. Since we find our Plaintiff was not subjected to any pre-arraignment detention and to any pre-trial custody restrictions when he reported to the DJ, and he was only required to attend a DJ preliminary hearing, the evidence shows that a Fourth Amendment seizure of Plaintiff did not occur. As stated, there is no dispute that Plaintiff was not handcuffed, not taken by police into their custody, and not detained.

As the Third Circuit sated in *Pardue v. Gray*, 136 Fed. Appx. 529 (3d Cir. 2005), C.A. No. 04-2784, 3d Cir. June 27, 2005 (Non-Precedential), slip op. pp. 4-5, "[i]n order to prevail on a § 1983 malicious prosecution claim, the Plaintiff must show an absence of probable cause for initiating the criminal proceedings."[21]

---

21. We note that to succeed on a § 1983 false arrest claim, as the Court in *Cummings v. City of Phila.*, 137 Fed. Appx. 504, 506 (3d Cir. 2005), stated:

> To succeed on a § 1983 claim for a Fourth Amendment violation
> due to a false arrest, plaintiff must prove that (1) the officer
> "knowingly and deliberately, or with a reckless disregard for
> the truth, made false statements or omissions that create a

Additionally, "prosecution without probable cause is not, in and of itself, a constitutional tort. Instead, the constitutional violation is the deprivation of liberty accompanying the prosecution. Thus ... a Plaintiff asserting a malicious prosecution claim must show some deprivation of liberty consistent with the concept of seizure." *Gallo v. City of Phila.*, 161 F. 3d 217, 222 (3d Cir. 1998) (internal citations and quotations omitted); *Brockington v. City of Phila.*, 354 F.Supp.2d 563, 568-69 (E.D. Pa. 2005). In a § 1983 malicious prosecution claim, Plaintiff must show that he suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding, as we have indicated is a required element above. However, as stated, Plaintiff focuses his initial argument in support of his § 1983 claim on the argument that there was not adequate probable cause for his arrest. (Doc. 20, pp. 9-11). Plaintiff then argues that both he and his property were seized by Defendants in violation of the Fourth Amendment. (*Id.*, pp. 11-13).

In *Gallo* (restraints on liberty sufficient were no arrest or detainment; $10,000 bond; restrictions on travel outside of state imposed; and weekly pretrial services contact required), were

---

falsehood in applying for a warrant;" and (2) that "such statements or omissions are material, or necessary, to the finding of probable cause." *Wilson v. Russo*, 212 F.3d 781, 786-87 (3d Cir. 2000) (internal quotation marks and citations omitted); *see also Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Omissions are made with reckless disregard "if an officer withholds a fact in his ken that any reasonable person would have known that this was the kind of thing the judge would wish to know." *Wilson*, 212 F.3d at 788 (internal quotation marks and citations omitted).

found to be sufficient restraints imposed on Plaintiff's liberty, particularly the geographic limitations, to amount to a seizure. *See Backof, supra* at *3.

Whether the evidence sufficiently shows that Plaintiffs suffered deprivation of liberty under the Fourth Amendment consistent with the concept of seizure as a consequence of a legal proceeding is the issue presently before this Court, since Defendants have raised this issue. Therefore, we must decide if the Plaintiff has established that he suffered a deprivation of liberty consistent with the concept of seizure as a consequence of his arrest.[22]

Plaintiff argues that since he turned himself into the DJ after he discovered charges were filed against him, since he was processed and released on his own recognizance, and since he had to attend a preliminary hearing, he was seized as required to demonstrate a Fourth Amendment claim. (Doc. 20, p. 12). Defendants argue that the cases upon which Plaintiff relies are distinguishable from our case. (Doc. 21, pp. 7-8). We concur with Defendants and their arguments as to why Plaintiff's cases are distinguishable from the instant case. (*Id.*). We agree with Defendants that *DiBella v. Borough of Beachwood*, 407 F. 3d 599 (3d Cir. 2005), is more on point with our case.

In *DiBella*, the Court stated that "[t]he type of constitutional injury the Fourth Amendment is intended to redress is the deprivation of liberty accompanying prosecution, not prosecution

---

22. In *Pardue*, this Court found that the restraints imposed on Plaintiff Pardue's liberty, including geographic restrictions, amounted to a seizure. We note that in the present case, according to the evidence, as a result of his arrest, Plaintiff was released on his own recognizance  with no specified bail conditions imposed upon him, such as geographic restrictions. As stated below, the mere fact that our Plaintiff had to attend a court hearing, *i.e.* preliminary hearing before the DJ, does not satisfy the seizure requirement based on *Hanks*, 581 F. Supp. 2d at 651.

itself." 407 F.3d at 603 (citation omitted).

The *DiBella* Court found that since the plaintiffs were only issued a summons, they were not arrested, they did not have to post bail, they were free to travel, and they did not have to report to pre-trial services, there was no seizure of plaintiffs sufficient to establish a Fourth Amendment violation with respect to a § 1983 malicious prosecution claim. *Id.* Plaintiff Penberth was not arrested, and he was not in pre-trial custody. Nor were there any onerous pre-trial, non-custodial restrictions imposed on him. Plaintiff Penberth has thus failed to establish a Fourth Amendment seizure with respect to his § 1983 claims.

Further, as Defendants recognize (Doc. 16, p. 5), and as the *Hanks* Court stated, "mere attendance at a hearing, ... did not cause [Plaintiff] to be 'seized.'" 518 F. Supp. 2d at 651. We find that the undisputed evidence as discussed above does not establish that our Plaintiff was ever taken into custody and that he suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding. *See DiBella, 407 F. 3d at 603; Hanks*, 518 F. Supp. 2d at 651; *Gallo,* 161 F. 3d at 222-223.

The Court stated in *Lopez v. Maczko*, 2007 WL 2461709, *3 (E.D. Pa. 2007):

> As to all the criminal charges, the plaintiff does not allege any facts that
> support he was seized as a consequence of a legal proceeding and, as a result,
> he fails to satisfy the fifth element of a federal malicious prosecution claim.
> *See Risich v. Bensalem Twp.,* No. 04-5305, 2005 U.S. Dist. LEXIS 2596,
> at *7-11 (E.D.Pa. Feb. 17, 2005) (discussing the seizure requirement for
> a Fourth Amendment malicious prosecution claim); *Godshalk v. Borough
> of Bangor,* No. 03-1465, 2004 U.S. Dist. LEXIS 7962, at *35-39 (E.D.Pa.
> May 5, 2004) (same). The legal proceedings were allegedly initiated
> by the defendants when they filed the police complaint, but the plaintiff's
> complaint does not contend that the defendants imposed any restrictions
> upon the plaintiffs' liberty after that point or after any arraignment
> or preliminary hearing. The only seizure alleged is the plaintiff's arrest

and that occurred *prior* to the initiation of any criminal proceedings. *See Nudelman v. Borough of Dickson City Police Dep't,* No. 05-1362, 2006 U.S. Dist. LEXIS 22154, at *11-12 (M.D.Pa. Apr. 12, 2006) (citing *Singer v. Fulton County Sheriff,* 63 F.3d 110, 117 (2d Cir.1995)) (dismissing § 1983 malicious prosecution claim because plaintiff did not plead the requisite connection between the criminal citation and his seizure).

Our Plaintiff was not arrested, and he did not have to post bail, communicate with pre-trial services, and he had no travel or geographic restraints placed on him. We find no Fourth Amendment seizure of Plaintiff as a result of the charges filed against him. *See Lopez*, 2007 WL 2461709, *4.

However, Plaintiff does not have to make a showing that he suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding if he can establish another violation of the Bill of Rights. *See Brockington*, 354 F.Supp.2d at 568-69, n. 4. Plaintiff argues that his car was also seized in violation of the Fourth Amendment. We agree with Defendants that there is no evidence that Plaintiff's car was seized by Defendants. (Doc. 21, p. 9). As discussed in detail above, the evidence shows only that, as part of the agreement to withdraw the charges against Plaintiff, Plaintiff was required to bring his car to Krajcirik's Garage on October 7, 2005 so that the police equipment could be removed from it. (Doc. 22-2, Att. #3). Plaintiff's car was returned on October 8, 2005. We do not find that Defendants seized Plaintiff's car in violation of the Fourth Amendment based on the undisputed evidence in our case.

Defendants state, "Plaintiff's claims for violation of §1983, and state claims for abuse of process and malicious prosecution are grounded in the Fourth Amendment. As such, their (sic) claims 'must show some deprivation of liberty consistent with the concept of seizure'." (Doc. 16, p. 4)(citations omitted). *See Johnson v. Knorr*, 477 F. 3d 75, 82 (3d Cir. 2007). Plaintiff's

Complaint clearly alleges that his federal claims in Counts Three and Four are based on violations of the Fourth Amendment (Doc. 1, ¶'s 35. and 41.).  As the *Johnson* Court noted, "[w]here the malicious prosecution claim sounds in the Fourth Amendment, the Plaintiff 'must show some deprivation of liberty consistent with the concept of seizure'." *Id*. at 85, n. 14.

Accordingly, since Plaintiff has not established a required element as to his §1983 claims against Defendants under the Fourth Amendment (Counts Three and Four), *i.e.* Plaintiff has not suffered a deprivation of liberty consistent with the concept of seizure as a consequence of the legal proceeding instituted by Defendants Strauss and Krajnak, we will grant Defendants' Summary Judgment Motion as to Plaintiff's claims based on the Fourth Amendment, namely, Counts Three and Four of his Complaint.

Also, since Count Four is Plaintiff's *Monell* liability claim against Defendant BL based on the Fourth Amendment (Doc. 1, ¶'s 41.-42.), and we have found no seizure of Plaintiff occurred under the Fourth Amendment and no underlying violation of Plaintiff's Fourth Amendment rights, we agree with Defendants (Doc. 21, p. 9) that the Court should grant Defendants' Summary Judgment Motion as to Count Four.

When a claim against a municipality or governmental entity, such as the Defendant BL, is based on Section 1983, the entity can only be liable when the alleged constitutional violation implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018 (1978).   A governmental custom for purposes of Section 1983 is defined as "such practices of state officials...[as are] so permanent and well-settled as to constitute a 'custom

or usage' with the force of law." *Id.* at 691.  Custom can be shown by evidence of knowledge and acquiescence by high-level policy-makers. *Fletcher v. O'Donnell*, 867 F.2d 791, 793 (3d Cir. 1989). The court must then inquire "whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).  The policy must be the "moving force" behind the constitutional violation. *Cornfield v. Consolidated High Sch. Dist. No. 230*, 991 F.2d 1316 (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985) (plurality opinion)).

In this case, with respect to the Plaintiff's Section 1983 claim against the Defendant BL in Count Four,  Plaintiff alleges in his Complaint that it is based on the Fourth Amendment. (Doc. 1, ¶'s 41.42.).  "A plaintiff must identify the challenged policy, attribute it to the city itself, and show a causal link between the execution of the policy and injuries suffered." *Losch v. Borough of Parkesburg*, 736 F.2d 903, 910 (3d Cir. 1984). The law is clear that liability will not be imposed under § 1983 on a *respondeat superior* or vicarious liability theory.  *See Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1027 (3d Cir. 1991); *Sterner v. Twp. of Tunkhannock*, 2006 WL 1004829 (M.D. Pa.).

"Policy is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy or edict.  A course of conduct is considered to be a 'custom' when, though not authorized by law, 'such practices of state officials [are] so permanent and well settled' as to virtually constitute law."  *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990) (citations omitted).

The Court in *Stoneking v. Bradford Area School District*, 882 F.2d 720, 725 (3d Cir. 1989), held that liability for state officials can arise "from their policies maintained in deliberate indifference to action taken by their subordinates." According to *Stoneking*, "a plaintiff must do more than show the defendant could have averted her injury and failed to do so. In order to establish liability a plaintiff must demonstrate both that the defendant's policy, practice, or custom played an affirmative role in bringing about the [harm] and that the defendant acted with deliberate indifference to that [harm]. In order to establish deliberate indifference on the part of the defendant, 'something more culpable [must be shown] than a negligent failure to recognize [a] high risk of harm' to plaintiffs." *Id.; Black by Black v. Indiana Area School District*, 985 F.2d 707, 712-13 (3d Cir. 1993) (quoting *Colburn*, 946 F.2d at 1025).

As stated, we agree with Defendants (Doc. 21, p. 9) that since we find Plaintiff has not established an underlying violation of his Fourth Amendment rights with respect to Count Three as against Krajnak and Strauss, Defendant BL is also entitled to summary judgment with respect to Plaintiff's *Monell* claim against this Defendant in Count Four based on the Fourth Amendment. Simply put, since we find no violation of Plaintiff's Fourth Amendment rights, there can be no municipal liability against Defendant BL based on a violation of the Fourth Amendment. *See Bornstad v. Honey Brook Twp.*, 211 Fed. Appx. 118, 126 (3d Cir. 2007)(Non-Precedential) ("for there to be municipal liability, there still must be a violation of Plaintiff's Constitutional rights")(citation omitted).

    2. *First Amendment Claim of Right to Association as Against Defendants, Counts Five and Six*

As his second federal claim against Defendants Krajnak and Strauss (Count Five) and

43

Defendant BL (Count Six) under §1983, Plaintiff asserts that they interfered with, and acquiesced in the interference of, his familial relationship with his father by pitting his father against him, thus depriving him of his First Amendment right to be free from such interference. (Doc. 1, ¶'s 46. and 53.). Plaintiff argues that his Complaint states an actionable claim for violation of his associational rights under the First Amendment. (Doc. 20, p. 14). Plaintiff states that he has alleged that Defendants instituted criminal charges against him to interfere with his familial relationship with his father. (*Id.*, p. 15). Plaintiff states that since his father was a member of the BL council, the timing of the charges against him created an inference of impropriety. (*Id.*). Plaintiff contends that criminal charges were filed against him to try and politically embarrass his father and to cause a rift between Plaintiff and his father. (*Id.*, p. 15). Plaintiff relies upon the case of *Board of Directors of Rotary International v. Rotary Club of Duarte*, 481 U.S. 537 (1987). Thus, Plaintiff claims that Defendants Strauss and Krajnak are liable under §1983 for violation of his First Amendment right to association with his family members and that Defendant BL is also liable for this First Amendment violation based on *Monell*.

We find that Plaintiff is raising an intimate association claim under the First Amendment, and not an expressive association theory. The Court in *Schultz v. Wilson*, 2007 WL 4276696, *8 (M.D. P.a 2007), stated:

> The right of intimate association protects the closest and most interdependent of human relationships against state interference. *See Pi Lambda*, 229 F.3d at 441-42. It protects relationships that " 'by their nature involve deep attachments and commitments to the necessarily few other individuals with whom one shares ... distinctively personal aspects of one's life.' " *Id.* (quoting *Roberts*, 468 U.S. at 619-20); *see also Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 545, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987). Family bonds represent the

44

quintessential form of intimate association, but the right may also extend to other relationships based on the " 'size, purpose, policies, selectivity, [and] congeniality' " of the group among which the relationships occur. *Id.* at 442 (quoting *Roberts,* 468 U.S. at 620). There is no specified size beyond which a group ceases to be intimate. Nevertheless, intimacy requires a small, tightly knit group, and gatherings of as few as twenty individuals have been denied intimate association status when they feature only social acquaintanceships. *See Duarte,* 481 U.S. at 546-47 (holding that local rotary clubs, which varied in size from twenty to nine hundred members, were not protected intimate associations); *Pi Lambda,* 229 F.3d at 442 (holding that fraternity of twenty-two individuals was too large to qualify as an intimate association, in part because it had sometimes had as many as eighty active members).[23]

Our Plaintiff alleges that Defendants violated his First Amendment rights due to a desire to politically embarrass his father and to cause a rift between he and his father, a BL council member. Plaintiff claims that Defendants' conduct interfered with his family bond which is "the quintessential

---

23.   There is also  First Amendment right to freedom of political association, but we do not find that our Plaintiff has alleged the violation of his First Amendment right of political association. As the Court stated in *DeFiore v. Vignola*, 835 F. Supp. 249, 251 (E.D. Pa. 1993):

> It is well settled that a state may not condition hiring or discharge of employees in a way which infringes on their right to political association. *Bennis v. Gable*, 604 F.Supp. 244, 251 (E.D. Pa. 1984).  Indeed, the courts have recognized that the basic right of political association is assured by the First Amendment to the United States Constitution and is protected against state infringement by the Fourteenth Amendment.  *Id.,* at 252, citing *Elrod v. Burns*, 427 U.S. 347, 356, 96 S.Ct. 2673, 2681, 49 L.Ed.2d 547 (1976).  Freedom of association includes the right to engage in group advocacy of various political beliefs and the right to organize effectively, assemble, speak, write and proselytize as individuals see fit.  *Orloski v. Davis,* 564 F.Supp. 526, 533 (M.D. Pa. 1983).

45

form of intimate association." *Id*.  Plaintiff claims that Defendants inflated the charges against him, i.e. the value of the police equipment left in the car, to justify a felony theft charge which caused more attention in the press, and thus caused a greater rift between Plaintiff and his father.  (*Id*.).

Defendants argue that Plaintiff does not cite to any evidence regarding a disruption of the relationship between him and his parents.  (Doc. 21, p. 10).  Defendants state that neither of Plaintiff's parents are named as parties to this case.  In his Brief, Plaintiff generally cites to evidence to support his First Amendment claim, and he claims that Sergeant Turcmanovich's testimony reveals that criminal charges were filed against him to politically embarrass his father.  (Doc. 20, p. 15).  However, Plaintiff does not cite to the pages of Sergeant Turcmanovich's testimony in his deposition, which is attached as the last exhibit to his Brief, Doc. 20-14.  We have reviewed Sergeant Turcmanovich's testimony, and he stated:

> Q.      Did anyone discuss with you why civil options weren't being pursued?
>
> A.      No, no.  They were going through with the criminal charges, and mainly because the items were not returned.
>
> Q.      Did anyone ever suggest to you that they wanted to use the criminal option in order to embarrass Dwight Penberth, Sr.?
>
> A.      No.
>
> Q.      That was never discussed.
>
> A.      Not with me.
>
> Q.      Did you hear that discussed with anybody?
>
> A.      No, sir.

46

Q.      Is this the first time you're hearing that, that the purpose of the  - - the motivation for doing this was to politically embarrass Dwight Penberth, Sr.?

A.      Is today the first time?

Q.      Yeah.

A.      No.

Q.      Where did you hear that before?

A.      I've heard that in general conversation about the proceeding, that that's one of the reasons why it's being pursued.  It's felt by people that it was done in retaliation or  - - I can't think of the term.  As you stated, it was done to embarrass Mr. Penberth.

Q.      Who has told you that?

A.      I've heard that in general conversations.

Q.      How many times?

A.      At least two.

Q.      And you can't remember who told you that?

A.      No.  Like I said, it was just some general conversations, why this is occurring, why t his proceeding is occurring.

Q.      The proceeding you're referring to is the criminal case?

A.      No, this litigation.

Q.      You think this litigation is to embarrass Dwight Penberth, Sr.?

A.      No, I'm sorry, I stand corrected.  The criminal charges were intentionally done to embarrass the Penberths.  But no, I don't believe so.

Q.      You heard people say that?

47

A.      I've heard that stated.  That's why it went to a litigation, that the charges against Dwight, Jr. - -

Q.      Who had the motivation for embarrassing Dwight Penberth, Sr.?

A.      I don't know who would have the motivation, sir.

Q.      I'm going to say the mayor's name wrong too, George Krajnak, is that right?

A.      Krajnak.

Q.      Krajnak.  Was his son-in-law involved in an election against Dwight Penberth, Sr., at this time?

A.      His son-in-law was running for borough council.

Q.      And Dwight Penberth, Sr., was running for borough council?

A.      Yes.

(Doc. 20-14, NT 27-30).

Based on Sergeant Turcmanovich's testimony, we do not find that Plaintiff correctly refers to this testimony to support his First Amendment claim.  Plaintiff states "Sergeant Turcmanovich['s] testimony ... is that criminal charges were brought against Plaintiff in an attempt to politically embarrass Plaintiff's father, with the desired result of causing a rift between Plaintiff and his father." (Doc. 20, p. 15).  However, the record shows that Sergeant Turcmanovich's testimony was that he did not believe that the criminal charges were intentionally filed against Plaintiff to embarrass his family, the Penberths, and that he only has heard that claim in general conversation on two occasions by people he does not remember.  We do not find that this hearsay evidence supports Plaintiff's First Amendment claim.  Further, Turcmanovich stated that he does not know who would

have any motivation for embarrassing Plaintiff's father.

Thus, we agree with Defendants that Plaintiff has failed to point to any evidence to show how that alleged actions by them interfered with the familial relationship between Plaintiff and his father. (Doc. 21, pp. 10-11).   Nor has Plaintiff offered any evidence to show that Defendants acted to politically embarrass his father.  Further, Plaintiff has not shown any evidence that shows his intimate relationship with his father was ever interfered with by Defendants.  We will thus grant Defendants' Summary Judgment Motion with respect to Counts Five and Six, federal claims under § 1983 based on the First Amendment.[24]

3.  *State Law Abuse of Process (Count One) and Malicious Prosecution (Count Two) Claims*

In Count One, Plaintiff raises a sate law abuse of process claim, and in Count Two he asserts a state law malicious prosecution claim.   The Court will decline to exercise supplemental jurisdiction over Plaintiff's remaining  state law abuse of process claim (Count One) and his state law malicious prosecution claim (Count Two) since all of his federal claims will be dismissed.  *See Johnson*, 477 F. 3d at 86, n. 15, "28 U.S.C. §1367(c)(3) provides that a district court may decline to exercise supplemental jurisdiction over state law claims if the court has dismissed all of the claims over which it had original jurisdiction."

Based on the foregoing, the Court will grant Defendants' Motion for Summary Judgment **(Doc. 15)** with respect to Plaintiff's federal claims in Counts Three, Four, Five and Six of the

---

24.  As stated above, we agree with Defendants (Doc. 16, p. 15 and Doc. 21, p. 9) and since we find no underlying First Amendment violation by Defendants Strauss and Krajnak, we will also grant Defendants' Summary Judgment Motion with respect to the *Monell* claim against Defendant BL based on the First Amendment, *i.e.* Count Six.

Complaint, and will enter judgment in favor of all Defendants and against Plaintiff on these Counts.

The Court will decline to exercise supplemental jurisdiction over Plaintiff's remaining two state law

claims, Counts One and Two.

An appropriate Order and Judgment will be issued.


**s/ Thomas M. Blewitt**
**THOMAS M. BLEWITT**
**United States Magistrate Judge**

**Dated: February 21, 2008**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DWIGHT A. PENBERTH, JR.,            :        CIVIL ACTION NO. **3:CV-06-1023**
                                    :
            Plaintiff               :
                                    :
        v.                          :        Magistrate Judge Blewitt
                                    :
GEORGE KRAJNAK, et al.,             :
                                    :
            Defendants              :
                                    :

### ORDER AND JUDGMENT

**AND NOW, this 21st day of February, 2008, IT IS HEREBY ORDERED THAT:**

1.   Defendants' Motion for Summary Judgment (**Doc. 15**) is **GRANTED** with respect to Plaintiff's federal claims in Counts Three, Four, Five and Six of the Complaint.

2.   The Court will decline to exercise supplemental jurisdiction over Plaintiff's remaining two state law claims, Counts One and Two.

3.   Judgment is hereby entered in favor of all Defendants and against Plaintiff with respect to Counts Three, Four, Five and Six of the Complaint.


                              **s/ Thomas M. Blewitt**
                              **THOMAS M. BLEWITT**
                              **United States Magistrate Judge**

**Dated: February 21, 2008**

51